Filed 5/21/15

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE, | C075250 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F1507) |
| v. | |
| JEREMIAH ALLEN JONES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Shasta County, Stephen H. Baker, Judge.  Affirmed as modified.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Peter H. Smith, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, II, and III of the discussion.

1

A jury found defendant Jeremiah Allen Jones guilty of three counts of making criminal threats, obstructing an officer, first degree burglary, and two counts of misdemeanor child endangerment. (Pen. Code, §§ 69, 273a, subd. (b), 422, 459.)[1] Defendant admitted two strikes, which were also alleged as two prior serious felonies, and admitted serving three prior prison terms. (§§ 667, subds. (a) & (b)-(i), 667.5, subd. (b), 1170.12.) The trial court sentenced defendant to prison for 25 years to life plus eight years, and defendant timely filed this appeal.

On appeal, defendant contends the trial court erred by: (1) having him shackled during trial; (2) admitting evidence of his gang membership; (3) failing to advise him of his rights before accepting his admission to prior convictions; and (4) failing to strike an enhancement allegation and instead staying it (§ 654).

The parties agree defendant's two serious felony convictions were not "brought and tried separately" as required by section 667, subdivision (a)(1), but disagree as to whether a trial court may impose and then stay sentence for one of those enhancements. As we explain *post* in the published portion of our decision, Part IV of the Discussion, the answer is no. We shall vacate the enhancement, modify the sentence, and affirm the judgment as modified.

## FACTS

M.H. lived in a motel with her daughters, aged nine and five. On March 5, 2013, defendant kicked in the door, took her mobile phone out of her hand, and took her wallet, keys, and a knife. M.H. called the police but did not cooperate and did not want to file a report. A maintenance man had seen defendant several times, apparently stalking M.H., and trying to enter her room.

---

[1] Further undesignated statutory references are to the Penal Code.

On March 8, 2013, defendant--armed with the knife he had taken--told M.H. he loved her when she returned to the motel. She told one of her daughters to ask her sister to call 911. Defendant threatened to "beat [her] ass" or "smash" her sister. When the sister left the room, defendant pulled the knife on M.H., pushed M.H. onto the bed, and shoved her older daughter against a wall. M.H. grabbed a baseball bat and began beating defendant, while her sister called 911. Defendant grabbed the bat from M.H., threw it away, and then threatened to "beat her ass" and to kill her.

When peace officers arrived, defendant was uncooperative. Officer Steven Morehouse arrived as defendant was being handcuffed, and recognized him due to a 2012 arrest based on a warrant from Southern California. He had learned then that defendant was a Crips gang member, both because of defendant's arm tattoo and his admission. During that prior arrest defendant became extremely violent and threatened that when his handcuffs were removed "he was going to knock somebody out, he was going to take somebody out" and it had taken five deputies to control him due to his violence.

On this occasion, Officer Morehouse took defendant to jail. When he tried to talk with defendant, defendant screamed, smashed his head against the patrol car's window, and kicked at the car door. As they left the motel, defendant screamed towards M.H.: "I'll be out tonight bitch. I'll be out tonight." He then shifted his remarks toward Morehouse, stating: "You're on, cuz. I'll be out tonight. I'll be back at you tonight, Morehouse." Defendant continued to scream, and asked what shifts Morehouse worked, and when Morehouse asked why he wanted that information, defendant said: "You'll find out. You can take that as a threat." He continued to swear and make threats, stating he was the "real deal" and would "bring this town to its knees." Morehouse audio-recorded some of defendant's comments, including, "You think I'm just sittin' over here just talking. I promise you, cuz, I'll get you knocked out as soon as you walk out this door."

3

Because of defendant's demeanor, his direct and articulate threats, and his membership in the Crips gang, Morehouse took the threat seriously. It was one of only a few threats he had received in his 23-year career as a peace officer that he took seriously, and he remained afraid defendant would attempt to implement his threats even as of the time of trial. Morehouse was a gang expert, and testified the Crips were a highly organized and extremely violent gang that committed crimes including assaulting and murdering peace officers. He feared defendant could retaliate, or arrange for a fellow gang member to retaliate, against Morehouse.

## DISCUSSION

### I

### *Restraints*

Defendant contends the trial court mishandled the issue of his restraints during trial. We disagree, and in any event find no prejudice.

A. *Background*

Before trial began, the trial court conducted a hearing regarding defendant's restraints. Defendant was handcuffed, with his hands beneath the table. Defense counsel stated he had discussed restraints with defendant, and defendant agreed to "nonvisible restraints, which would be the Bandit or a leg brace. He is opposed to being shackled . . . such as he is right now." Defendant advised the court that he had been in a Bandit (an under-the-clothing electronic leg restraint) before, and had no objection to wearing it at trial.

Deputy Marshal Gary Cropley testified that based on defendant's jail conduct and criminal record he should wear belly chains and leg restraints for the trial. He related defendant's conduct toward the officers on March 8. He testified that when defendant had been in local custody in September 2012, he made numerous threats towards correctional staff and tried to start fights during intake. Defendant had added that he would rather "catch a fresh assault" in Shasta County than be returned to Riverside

4

County. While being taken to court on March 12, 2013, defendant made multiple threats to officers, and ultimately had to be removed from court. He made other threats or defiant comments to officers on other dates and had participated in a race-based jail fight. Defendant's criminal record included a 1997 robbery conviction, a 1998 conviction for obstructing a peace officer, and a 2011 conviction for inflicting corporal injury on a cohabitant, after which he was housed at Pelican Bay State Prison. The marshal was concerned about the Bandit's effectiveness, but testified that leg chains could be used without also using visible handcuffs.

Based on this information, the trial court found there was a manifest need for some kind of restraints, but thought leg chains, not visible to the jury, would be sufficient, to allow defendant to use his hands "so he can more freely participate in his defense." Defense counsel objected that the leg chains were visible, and rattled when defendant moved in what counsel characterized as a very small courtroom. The marshal added that if defendant's hands were to be free, it would be better to use the Bandit than leg chains. That was the trial court's order.[2]

The next day, before the prospective jurors were brought in for voir dire, defendant elected to appear in jail clothes. The trial court went on record to note this fact, and to confirm defendant's wishes, whereupon defendant said: "Why sit up here and lie? I'm already being cheated. Fuck all that. I'm cool, cuz. I just told you already." Defense counsel added that defendant was also in visible restraints, at defendant's request. Defense counsel opposed this circumstance, but believed the law did not permit him to overrule his client's wishes.

---

[2] In the middle of the marshal's testimony, defendant interjected that he did not care about restraints since he was going to be convicted anyway. He repeated his view after the trial court made the restraint ruling, stating, "just get it over with so I can get back to prison and get cracking."

5

When the prospective jurors were seated, the trial court admonished them as follows: "The fact that physical restraints have been placed upon Mr. Jones in this case is not evidence, nor is the fact that he's in custody or wearing jail clothing. You're not to speculate about the reason why this is the case. You must completely disregard these circumstances in deciding the issues in this case. Do not consider these factors for any purpose whatsoever, nor discuss them during your deliberations."

The next day, defendant appeared in civilian clothing, but still with visible restraints, and defense counsel objected to the restraints. The trial court ruled that defendant had made his choice the day before, and "the cat's out of the bag." Although defendant was free to wear different clothing, the trial court told him it was not going to order different restraints day to day based on defendant's whim. The trial court recited the history of the issue, and in particular noted visible chains were "the most preferable form or restraint for the Court and for my security staff, but on the first day of trial . . . we were able to make a decision to use this Bandit instead and your client consented to that clearly and unequivocally. [¶] But, then he changed his mind and we went to the chains yesterday." After defense counsel stated the trial court needed to make a determination justifying the increased level of restraint, the trial court stated "there have been some changes in circumstances" and described that defendant may have threatened defense counsel at a prior in camera *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118), about which the trial court was reluctant to disclose too much. Also, defendant seemed agitated, but the trial court later stated, "[I]f there were even a need for changed circumstances to justify the use of chain restraints, you would certainly have those changed circumstances, but I really don't think that I need to make that finding in order to justify the use of chains now."[3]

_____

[3] Appellate counsel notes the *Marsden* hearing transcript is confidential, but because appellate counsel also attacks the adequacy of the trial court's findings, we must quote a

At the end of the trial, the trial court again admonished the jurors to disregard restraints and not speculate about why they were employed.

Defendant now contends the trial court misapplied the rules regarding restraints.

B. *The Law*

"No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge." (§ 688.) Based on "possible prejudice in the minds of the jurors, the affront to human dignity, the disrespect for the entire judicial system which is incident to unjustifiable use of physical restraints, as well as the effect such restraints have upon a defendant's decision to take the stand," our Supreme Court has reaffirmed the rule "that a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People v. Duran* (1976) 16 Cal.3d 282, 290-291.) Restraints "should be as unobtrusive as possible, although as effective as necessary." (*Id*. at p. 291.) A trial court has broad discretion to determine the need for and necessary level of restraints. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 987.)

---

portion of the confidential transcript to address the claims. At the referenced *Marsden* hearing that occurred the previous day, the trial court assured defendant he could have as much time as needed to dress in civilian clothing, and confirmed defendant wanted to be shackled. After the trial court stated, "I don't think that's necessarily in your best interests either," defendant replied: "Why lie?" Earlier during that same hearing, defendant had said, "Right now I'm being cool about the situation, but in a second I'm not gonna be cool. . . . [¶] I'm trying to be cordial as possible so that I don't get restrained, beat up, choked out while I'm handcuffed like this, and I don't want to take a Tase. So . . . the reason why I allowed myself to be in mechanical restraints [was] to protect myself from doing anything that would cause me to ruin myself." When defense counsel began to argue that if defendant was physically threatening him, that might provide grounds for new counsel, defendant said he was not threatening anybody. Later, the trial court said defendant was agitated, and defendant said he was "[b]eyond agitated. I'm getting played."

C. *Analysis*

Although defendant voluntarily appeared in visible shackles one day after the trial court ordered non-visible restraints, we agree with appellate counsel that that act alone did not forfeit defendant's right to return to the less restrictive device, and the trial court should have made findings about changed circumstances justifying greater restraints. However, as we read the record, the trial court *did* find changed circumstances, namely, defendant's threats at the *Marsden* hearing the prior day, as well as his demeanor, which even defendant described as "[b]eyond agitated."

It is true the trial court suggested it did not need to find changed circumstances to elevate the level of restraints. Appellate counsel contends the trial court's statements about the threats were only an afterthought to the trial court's view that defendant had let the cat out of the bag. But after trial counsel objected to an increase in restraints absent new findings, the trial court first found the threats and defendant's agitation reflected changed circumstances, and then made the comment that it did not believe such additional findings were necessary. Read in context, the trial court's later comment was an aside that did not cancel out the changed circumstances finding the trial court had already made in response to defense counsel's objection.

Defendant concedes a threat of courtroom violence can show manifest need for restraints (see, e.g., *People v. Stankewitz* (1990) 51 Cal.3d 72, 95-97), but suggests his threat did not qualify as a changed circumstance justifying a higher level of restraints. We defer to the trial court's view that defendant's words at the *Marsden* hearing were a threat and that threat and defendant's high level of agitation during the *Marsden* hearing (see fn. 3, *ante*) qualified as sufficient changed circumstances to justify leaving him in the chains that he had elected to wear in front of the jury the day before.

Even assuming error of federal constitutional dimension, we would hold any error harmless beyond a reasonable doubt. (See *Deck v. Missouri* (2005) 544 U.S. 622, 635 [161 L.Ed.2d 953, 966].) This court has described the test as follows: "To find the error

8

harmless we must find beyond a reasonable doubt that it did not contribute to the verdict, that it was unimportant in relation to everything else the jury considered on the issue in question." (*People v. Song* (2004) 124 Cal.App.4th 973, 984; see *Yates v. Evatt* (1991) 500 U.S. 391, 403-404 [114 L.Ed.2d 432, 448-449].)

The prospective jurors saw defendant in jail clothing and shackles, at defendant's choice, not because of any ruling by the trial court or action by the jail authorities. We have pointed out in a prior case involving shackling of *witnesses*, that any prejudice arises in the minds of the jurors "as soon as they learn the witness is an inmate; the presence of shackles is superfluous to that concern." (*People v. Valenzuela* (1984) 151 Cal.App.3d 180, 194; see *People v. Ceniceros* (1994) 26 Cal.App.4th 266, 281.) The jury learned defendant was in custody due to his own choice; therefore, *that* amount of prejudice is attributable to him. Trial counsel himself pointed out what defendant had done "sheds the cloak of innocence, so to speak." Thus, even assuming error, it only incrementally increased the possible prejudice to defendant.

Defendant emphasizes authority holding that "while a brief glimpse of defendant in shackles would not constitute prejudicial error [citations], the use of physical restraints in the courtroom without a prior showing of the manifest need for such restraints violates *Duran* [citation.] When such restraints are visible to the jury for a substantial length of time without meeting the *Duran* requirements, this trial court error may deprive defendant of his due process right to a fair and impartial jury, and may affect the presumption of innocence." (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1830.)

However, again assuming error occurred, we do not believe defendant was deprived of due process in this case.

First, defendant chose not to testify, so the jury was not subjected to the spectacle of a shackled defendant testifying. Second, the crimes themselves were violent, so the jury would naturally assume some security measures were required. (See *People v. Jackson*, *supra*, 14 Cal.App.4th at p. 1831 ["defendants did not testify in chains," and

9

"since the bulk of the violent crimes charged consisted of shots fired at police officers, it would be reasonable for the jury to expect some security precautions"].)  Third, the jury was properly admonished to disregard defendant's custody and restraint status.  (See *People v. Duran*, *supra*, 16 Cal.3d at pp. 291-292 ["In those instances when visible restraints must be imposed the court shall instruct the jury *sua sponte* that such restraints should have no bearing on the determination of the defendant's guilt"].)  We presume the jury heeded the admonition.  (See *People v. McDaniel* (2008) 159 Cal.App.4th 736, 746-747 ["reasonable to presume that jurors can follow an admonition to disregard shackles that is given at the beginning of trial"].)  Fourth, the jury acquitted defendant of robbery, burglary, and theft charges related to the March 5, 2013, incident.  This shows that it was not so inflamed by seeing him in chains that it abandoned its duty to fairly assess the evidence and hold the People to their high burden of proof.  Fifth, as to the counts of which defendant stands convicted, the evidence was quite strong.

Appellate counsel asserts that M.H. "was discredited as a liar" based on disputed evidence about whether she and defendant had had a romantic relationship and based on the opinion of her child's father's parole officer that she made up reasons to have the parolee picked up.  Further, counsel notes that other evidence was vulnerable (e.g., the maintenance man was a convicted child molester, the sister had been a drug user and thought defendant was on drugs, and defendant did not "smash" her as he threatened although he had the chance).  But there were multiple witnesses to the motel incidents who gave interlocking testimony, and partial audio recordings to corroborate Officer Morehouse's testimony about defendant's threats to him.  There was no developed defense of intoxication, as appellate counsel muses.  Accordingly, we reject defendant's claim of prejudicial error regarding restraints.

10

## II

### *Admission of Gang Evidence*

Defendant contends the trial court improperly permitted the People to introduce evidence of his membership in a street gang, in a case where no gang charges were at issue. We find no error.

To prove the section 422 charges, the People had to prove that the threat caused the victim "reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422; see *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1536; CALCRIM No. 1300.) At an in limine hearing to address the evidence proffered by the People to show Morehouse's reasonable and sustained fear, he testified that defendant's charged threats to him caused actual fear because of: (1) defendant's violent criminal background then known by Morehouse, including both convictions and arrests, including two arrests for attempted murder, one of which was for attempted murder of a peace officer; (2) Morehouse's knowledge of defendant's gang affiliation, specifically, Logan Heights Crips in San Diego, and the fact defendant openly sported a Crips tattoo on his arm; (3) Morehouse's experience as a gang expert, which taught him that the "Crips are a very violent and organized gang" that commits many felonies; and (4) defendant's hostile demeanor and threats against peace officers and jail staff when Morehouse previously arrested defendant on a warrant in 2012. Thus, Morehouse's *actual knowledge* of defendant's actions and affiliations made what might have been taken as the otherwise powerless threats of an arrestee much more serious, in Morehouse's mind.

The trial court initially excluded the gang evidence, as cumulative of other evidence known to Morehouse sufficient to place him in sustained fear, and out of a concern that the jury might also consider that evidence in determining whether the named victims in two other section 422 counts were placed in sustained fear on the same day. Similarly, the trial court excluded references to prior crimes; however, the trial court

11

ruled that Morehouse's *personal interactions* with defendant on the occasion of the 2012 arrest would be admissible.

Later, considering a subsequent motion, the trial court revisited the issue. Noting that the previous day the jury had seen defendant in jail clothing, displaying his tattoos including a gang tattoo, the court allowed testimony about Morehouse's knowledge of defendant's gang membership (but not his prior criminal record) to show his fear of defendant.

The trial court then instructed the jury, modified as proposed by defense counsel over objection, as follows: "The evidence of defendant's gang membership can only be considered for the limited purpose of the effect such evidence had on Officer Steven Morehouse's state of mind as it relates to the criminal threat charge in Count 5. Do not consider this evidence for any other purpose or for any other charged crime. *There's no evidence that Mr. Jones is a gang member. The People are not contending that fact. You may not assume or conclude that the defendant is, in fact, a gang member. There's no evidence to that effect.* Do not conclude from this evidence that the defendant is a person of bad character or has a disposition to commit crime." (Italics added.)

The trial court gave a similar instruction at the end of the trial.[4] During opening and closing arguments, the prosecutor properly referenced the gang testimony only as it related to the criminal threats charge and the charge of using threats to obstruct an officer from performing lawful duties involving Morehouse, not the threats charges involving the other victims.

---

[4] Contrary to the italicized language, there was indeed evidence to the effect that defendant was a gang member. Morehouse testified as a gang expert that defendant fit the criteria of a gang member and admitted to Morehouse that he was a gang member. Nonetheless, the gist of the instruction accurately described the limited purpose of the evidence to the jury.

On appeal, defendant contends the evidence was irrelevant because "Morehouse's belief [that defendant was a gang member] may have affected his fear, but [defendant] did not plant the belief or attempt to capitalize on it." This amounts to a jury argument, because if the jury credited Morehouse's testimony, it could well find defendant--who sported a visible gang tattoo and had been arrested by Morehouse the prior year--knew that Morehouse knew he was a gang member, and therefore defendant intended his threats to be taken seriously. Indeed, the jury could find that defendant *explicitly* capitalized on his gang membership by stating, "I promise you, cuz, *I'll get you knocked out* as soon as you walk out this door." (Italics added.) This statement indicates defendant could arrange to have someone else harm Morehouse, inferentially, one or more gang members, if defendant were unable to harm Morehouse personally.

Clearly, this was not *cumulative* evidence, as the trial court initially ruled. It was materially different than Morehouse's testimony about his prior interaction with defendant. Therefore the trial court was correct to revisit the issue. Further, this evidence was highly probative, as it distinguished defendant's threats from the many mundane and generally impotent threats Morehouse had received during his career.

Because gang evidence can be highly inflammatory, its admission is limited to cases where it is directly relevant to some issue in dispute. "As general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative. [Citation.] Consequently, gang evidence may be relevant to establish the defendant's motive, intent or some fact concerning the charged offenses other than criminal propensity as long as the probative value of the evidence outweighs its prejudicial effect. [Citations.] 'Evidence of the defendant's gang affiliation--including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like--can help prove identity, motive, modus

13

operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223-224.)

In *People v. Mendoza* (2000) 24 Cal.4th 130, at page 178, our Supreme Court found that a robbery victim's belief that the robber was a gang member was "directly relevant to establishing the element of fear" required to establish a robbery. (See also *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340-1342 [victim's knowledge that defendant was in a gang could be used to determine how the victim interpreted defendant's threat].) Here, too, as explained *ante*, the prosecutor had the burden to prove to the jury beyond a reasonable doubt that Morehouse, an experienced police officer, was placed in "sustained fear" because of defendant's threatening comments. The evidence was highly probative, and was not presented in an inflammatory manner. The risk of prejudice was further minimized by the trial court's limiting instruction. We find no error.

### III

### *Advisement of Rights*

Defendant contends--and the People properly concede--that in accepting defendant's admissions to the various prior conviction allegations, the trial court did not explicitly advise defendant of two of the three constitutional rights required to be included in the advisement.

The need to advise defendants of the right to a jury trial, the right to confront witnesses, and the privilege against self-incrimination, before accepting an admission to a prior conviction allegation has been the law for over 40 years. (See *In re Yurko* (1974) 10 Cal.3d 857, 863 & fn. 5.) It must be adhered to. However, in this particular instance we find no prejudice to defendant.

Immediately after the jury retired to deliberate, defense counsel stated on the record that he had discussed the priors with defendant, and defendant wished to provisionally admit them. The trial court told defendant he had the right to a jury

14

determination of the priors, but did not advise him of his right to confront witnesses or the privilege against self-incrimination. Defendant had just undergone a jury trial where he exercised his privilege against self-incrimination, and observed his attorney cross-examine and thereby confront witnesses against him. We must presume he was aware that those rights accompanied the right to a jury determination. (See *People v. Mosby* (2004) 33 Cal.4th 353, 356 ["When, immediately after a jury verdict of guilty, a defendant admits a prior conviction after being advised of and waiving only the right to trial, can that admission be voluntary and intelligent even though the defendant was not told of, and thus did not expressly waive, the concomitant rights to remain silent and to confront adverse witnesses? The answer is 'yes,' if the totality of circumstances surrounding the admission supports such a conclusion"].) Further, defendant was no stranger to the criminal justice system. (See *id* at p. 365 [" 'a defendant's prior experience with the criminal justice system' is, as the United States Supreme Court has concluded, 'relevant to the question [of] whether he knowingly waived constitutional rights' "].)

Defendant posits that this case falls between cases where *no* rights are given (e.g., *People v. Moore* (1992) 8 Cal.App.4th 411, 416-418), and cases where two of the three rights were given (e.g., *People v. Howard* (1992) 1 Cal.4th 1132, 1179-1180). We are not persuaded.

First, we do not merely count up rights. We must look at the totality of the circumstances, to determine whether the admission was voluntary and intelligent. (See *People v. Howard*, *supra*, 1 Cal.4th at p. 1175.) Second, the advisement of *the right to a jury trial* incorporates the rights known to a defendant *who has just undergone a jury trial*. That was the central holding of *Mosby*. (See *People v. Mosby*, *supra*, 33 Cal.4th at p. 364.) In these circumstances, the trial court's error was not prejudicial to defendant.

IV

*Sentencing*

The parties agree that defendant's two prior serious felony convictions (robbery and attempted robbery) were *not* "brought and tried separately" as provided by section 667, subdivision (a). Because the two priors were charged together under the same case number and adjudicated in the same proceeding, we agree. (See *In re Harris* (1989) 49 Cal.3d 131, 136 [brought and tried separately means "the underlying proceedings must have been formally distinct, from filing to adjudication of guilt"].)

The People cursorily contend the trial court's act of imposing but staying execution of sentence for one of the priors under section 654 properly implements the statute. We disagree.

Section 667, subdivision (a)(1) provides in relevant part that "any person convicted of a serious felony who previously has been convicted of a serious felony in this state or of any offense committed in another jurisdiction which includes all of the elements of any serious felony, shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately. The terms of the present offense and each enhancement shall run consecutively." Parsed as relevant herein, any person convicted of a "serious felony" as defined later in the statute "shall receive" on top of the rest of the sentence an additional "five-year enhancement for each such prior conviction on charges brought and tried separately." (§ 667, subd. (a)(1).)

"Section 667(a) enhancements must be imposed for *each* prior serious felony conviction 'separately brought and tried.' The question whether prior convictions were brought and tried separately is for the court to decide, not the jury." (Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2014) § 20:27, p. 20-14; see 3 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Punishment, § 405, p. 626 ["A 5-year consecutive enhancement must be imposed for each prior conviction on charges 'brought and tried

16

separately' "], *id.* § 411, p. 636 ["Each prior conviction must stem from 'charges brought and tried separately' "].)

Two prior decisions of this court confirm that only those priors brought and tried separately qualify.   (See *People v. Wagner* (1994) 21 Cal.App.4th 729, 732-737 [clarifying what "brought and tried separately" means in practice]; *People v. Deay* (1987) 194 Cal.App.3d 280, 286-290 [agreeing that one of two prior serious felony convictions had to be vacated because the two were not brought and tried separately].)  The gist of these holdings is that it is an *element* of the prior serious felony enhancement that the charges be "brought and tried separately" and where, as in this case, multiple serious felonies were proven in a single prior proceeding, the People cannot prove more than one such enhancement exists.

The People briefly assert that *staying* the effect of one of the two prior serious felonies that were not brought and tried separately is sufficient under the statute, so that a defendant only receives punishment for one of them, consistent with the statutory purpose, in their view.  However, under section 654, a stayed sentence is one that has first been *imposed*, but because of some legal rule must be stayed to prevent the infliction of any *punishment* for such imposed sentence.  Imposing a stayed sentence results in the *receipt* of a sentence, albeit one that is not executed absent some subsequent reason to lift the stay.  (See *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468-1470.)

But as outlined above, section 667, subdivision (a)(1) is written so as to require that the defendant "shall receive" an extra sentence for and only for those prior convictions that were "brought and tried separately" and such requirement is an element of the enhancement.  Thus, the mere *imposition* of sentence for a prior conviction that was *not* brought and tried separately runs afoul of the statute, whether or not the sentence is executed.

The case authority cited but not analyzed by the People is inapposite, as it involves other statutory situations, such as where a prior serious felony conviction enhancement

17

and a one-year prior prison term enhancement (§ 667.5, subd. (b)) are based on the same conviction (*People v. Walker* (2006) 139 Cal.App.4th 782, 794, fn. 9), or where a trial court must choose between alternative sentencing schemes provided by the "one-strike law" and the "habitual sexual offender law" (§§ 667.61, 667.71; see *People v. Lopez* (2004) 119 Cal.App.4th 355, 360-366). Both of the People's cases in turn relied on a sentencing rule providing as follows: "No finding of an enhancement may be stricken or dismissed because imposition of the term either is prohibited by law or exceeds limitations on the imposition of multiple enhancements. The sentencing judge must impose sentence for the aggregate term of imprisonment computed without reference to those prohibitions and limitations, and must thereupon stay execution of so much of the term as is prohibited or exceeds the applicable limit. The stay will become permanent on the defendant's service of the portion of the sentence not stayed." (Cal. Rules of Court, rule 4.447.)[5]

Rule 4.447 begins by stating, "No finding of an enhancement may be stricken or dismissed" to comply with legal limitations. One of the People's cited cases emphasizes that "A stay under rule 4.447 is not issued under Penal Code section 654. Nevertheless, it is analogous." (*People v. Lopez*, *supra*, 119 Cal.App.4th at p. 365.)

In the instant case, the *finding* that two serious priors existed was itself erroneous, because those priors were not brought and tried separately. Thus rule 4.447 never came into play.[6]

---

[5] Further references to rules are to the California Rules of Court.

[6] We note the comment to rule 4.447 references illustrative statutes that would trigger it, including section 667, subdivision (a)(*2*), but *not* subdivision (a)(*1*). (See Advisory Com. com., 23 pt. 1B West's Ann. Codes, Court Rules (2006) foll. rule 4.447, p. 325.) *People v. Gonzalez* (2008) 43 Cal.4th 1118, involving multiple firearm enhancements, addressed section 12022.53, subdivision (f)'s requirement that only one additional term therefor may be imposed. *Gonzalez* explained "impose" can mean impose *and execute* or

18

## DISPOSITION

The judgment is modified by vacating the prior serious felony the trial court imposed but stayed under section 654.  As modified, the judgment is affirmed.  The trial court shall prepare and forward to the Department of Corrections and Rehabilitation a certified copy of an amended abstract of judgment.


        DUARTE        , J.


We concur:


    ROBIE      , Acting P. J.


    MAURO     , J.

---

impose *and stay*, and held the proper way to handle multiplicative firearm enhancements is to impose sentence on each, and stay execution of sentence on all but one.  (*Gonzalez,* at pp. 1124-1130.)  But nothing in *Gonzalez* addressed section 667, subdivision (a), which requires that multiple prior convictions be proven to have been brought and tried separately before found to be valid enhancements and sentence imposed therefor.